**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------X Case No.: 23-cv-06163

GODFREY DAVIS,

Plaintiff,

**COMPLAINT**

-against-

WESTLAKE SERVICES, LLC d/b/a
WESTLAKE FINANCIAL SERVICES and
AMERICARNA AUTO SALES LLC,

Defendants.

-------------------------------------------------------------X

Plaintiff, by and through his attorneys, FAGENSON & PUGLISI, PLLC, upon knowledge as to himself and his own acts, and as to all other matters upon information and belief, brings this complaint against above-named defendants and in support thereof alleges the following:

INTRODUCTION

1. Plaintiff brings this action because defendant Americarna Auto Sales LLC, a used car dealership, saw it fit to steal money from plaintiff, who was then a 74-year-old senior citizen simply seeking to purchase a used vehicle from the dealership. When plaintiff discovered that the dealership had sold him the vehicle for more than he had agreed to pay and for more than the advertised price, plaintiff contacted the dealership and asked that the dealership explain to him the reason for the overcharge and restore to him to him the monies unlawfully appropriated. The dealership declined, informing plaintiff he was never getting his money back. When plaintiff complained to

co-defendant Westlake Services, LLC d/b/a Westlake Financial Services (or "Westlake") and asked Westlake to contact the dealership and procure the dealership to give him his money back, Westlake hazarded guesses to plaintiff as to what the basis of the overcharge might have been, but told plaintiff that it would not contact the dealership on his behalf and that there was nothing Westlake could do to help him. Westlake did not offer to remove from the loan which plaintiff was repaying to Westlake the unlawful $1,500 charge.

2. Defendants perpetrated other unlawful, unfair and abusive acts against plaintiff.

3. Misconduct by defendants as alleged herein causes untold anguish and suffering each day, ruining the enjoyment of life of ordinary, vulnerable members of the public. Defendants have caused plaintiff harm and continue to date to cause plaintiff harm. Having received no relief from defendants, plaintiff brings this action to redress that harm.

4. Plaintiff brings this action seeking damages against the dealership pursuant to the federal Truth in Lending Act, 15 U.S.C. § 1601 *et seq*., damages against defendants for common-law fraud, relief against defendants pursuant to New York Motor Vehicle Retail Instalment Sales Act ("MVRISA")–New York Personal Property Law § 301 *et seq*., and injunctive relief and damages against defendants pursuant to New York General Business Law ("NYGBL") §§ 349 and 350 for defendants' deceptive acts and practices and false advertising.

JURISDICTION AND VENUE

5. Plaintiff re-alleges paragraphs 1-4 as if fully re-stated herein.

6. This Court has federal jurisdiction pursuant to the Truth in Lending Act ("TILA"), 15 U.S.C. § 1640(e) and 28 U.S.C. § 1331. Supplemental jurisdiction exists over the state law claims pursuant to 28 U.S.C. § 1367 as they arise out of the same set of transactions forming the basis of the federal claims.

7. This Court has venue pursuant to 28 U.S.C. § 1391(b) in that a substantial portion of the events or omissions giving rise to this action occurred in this District.

PARTIES

8. Plaintiff re-alleges paragraphs 1-7 as if fully re-stated herein.

9. Plaintiff is a natural person who at all relevant times resided in Queens, New York.

10. Upon information and belief, defendant Westlake Services, LLC d/b/a Westlake Financial Services is a foreign limited liability company formed under the laws of the State of California.

11. Upon information and belief, Westlake was and is duly authorized to do business and doing business in the State of New York.

12. Defendant Americarna Auto Sales LLC (or "dealership) is a domestic limited liability company with a principal place of business in Bronx County, State of New York.

13. Americarna Auto Sales LLC is a retail dealer in used automobiles.

14. In July 2022, there was a retail sales financing agreement between defendants.

15. In July 2022, there was a dealer agreement between defendants.

16. Plaintiff entered into a consumer credit transaction with the dealership as contemplated by 15 U.S.C. § 1602(i), in that the money, property or services which were the subject of the transaction were primarily for personal, family or household purposes.

17. The dealership is a "creditor" within the meaning of 15 U.S.C. § 1602(g) and 12 C.F.R. § 226.2(a)(17) because at all material times the dealership, in the ordinary course of its business, regularly extended consumer credit which is payable in more than four installments or for which the payment of a finance charge is or may be required, and the dealership is the person to whom the debt arising from the consumer credit transaction was initially payable.

18. The consumer credit transaction out of which this action arose is a transaction pursuant to the Federal Trade Commission "Holder Rule", 16 C.F.R. 433.2 and its New York state analog, New York Personal Property Law § 302(9).

19. The dealership assigned to Westlake the retail installment contract purportedly signed by plaintiff.

20. As of the date of commencement of this action, the net worth of Westlake is greater than Thirty Million Dollars ($30,000,000).

21. As of the date of commencement of this action, the net worth of the dealership is greater than Four Million Dollars ($4,000,000).

22. Westlake is liable to plaintiff for its own misconduct and by virtue of the Holder Rules, is jointly and severally liable with the dealership to plaintiff for the misconduct of the dealership herein.

## FACTUAL ALLEGATIONS

23. Plaintiff re-alleges paragraphs 1-22 as if fully re-stated herein.

24. In July 2022, plaintiff saw advertised online a used 2011 Infiniti M37 automobile bearing vehicle identification number JN1BY1AP3BM323900 (the "Vehicle").

25. In the advertisement, the sale price of the Vehicle was $13,995.

26. Plaintiff decided to visit the dealership to view the Vehicle with the intention of purchasing it.

27. On July 16, 2022, accompanied by several relatives and friends, plaintiff visited the dealership.

28. At the dealership, plaintiff met Omar Todman ("Omar").

29. On July 16, 2022, Omar was a salesman at the dealership.

30. On July 16, 2022, Omar was the salesman at the dealership who dealt with plaintiff.

31. On July 16, 2022, Omar was an employee of the dealership.

32. On July 16, 2022, Omar was an employee of the dealership who dealt with plaintiff.

33. As of the date of commencement of this action, Omar is a salesman at the dealership.

34. As of the date of commencement of this action, Omar is an employee of the dealership.

35. Omar showed the Vehicle to plaintiff, plaintiff's relatives and friends.

36. Plaintiff then told Omar that he wished to purchase the Vehicle.

37. Omar told plaintiff that the price of the Vehicle was $16,995.

38. Plaintiff told Omar that the price in the advertisement was $13,995 and that he, plaintiff, would be willing to pay only the advertised price of $13,995, not $16,995.

39. Omar then told plaintiff that the dealership would honor the price of $13,995 in the advertisement and would sell him the Vehicle for $13,995.

40. Plaintiff was thereafter shown to the office of the finance manager.

41. On information and belief, the finance manager who dealt with plaintiff on July 16, 2022 was Jay.

42. On July 16, 2022, Jay was a finance manager at the dealership.

43. On July 16, 2022, Jay was the finance manager at the dealership who dealt with plaintiff.

44. On July 16, 2022, Jay was an employee of the dealership.

45. On July 16, 2022, Jay was an employee of the dealership who dealt with plaintiff.

46. As of the date of commencement of this action, Jay is a finance manager at the dealership.

47. As of the date of commencement of this action, Jay is an employee of the dealership.

48. Certain of his relatives and friends accompanied plaintiff to Jay's office.

49. Plaintiff told Jay that he was purchasing the Vehicle for the price advertised online of $13,995, plus sales tax and customary fees and charges.

50. Jay agreed that the dealership would sell plaintiff the Vehicle for $13,995, plus sales tax and customary fees and charges.

51. Plaintiff gave the dealership a down payment of $3,600.

52. Jay did not give plaintiff any document to read or keep before Jay began to attach plaintiff's electronic signature to certain documents.

53. Jay did not give plaintiff the Truth in Lending Act disclosures before Jay began to attach plaintiff's electronic signature to certain documents.

54. Jay did not give plaintiff an MV-50 certificate of sale.

55. Jay did not give plaintiff the retail installment contract.

56. Thereafter, plaintiff reviewed certain documents concerning his purchase of the Vehicle.

57. It was then that plaintiff first noticed a charge of $1,500 included in the charged for which he paid the dealership.

58. On or about July 1, 2023, plaintiff telephoned the dealership and spoke with Jay.

59. Plaintiff asked Jay what the $1,500 charged was for.

60. Jay told plaintiff that the charge was, "for our profit" because of the financing.

61. When plaintiff told Jay that he did not agree to pay an extra charge of $1,500 so he would like that money back, Jay told plaintiff that, "everybody does it. All the dealerships do it."

62. When plaintiff continued to ask Jay for the $1,500 back, Jay told plaintiff that the dealership would not give him back the money.

63. Jay told plaintiff that the dealership would not give him back the $1,500.

64. Thereafter, plaintiff realized that the dealership had not given to him certain documents, one of which was the retail installment contract ("RIC").

65. Plaintiff telephoned Westlake and complained to Westlake about the unlawful $1,500 charge which the dealership had included in the sale.

66. Westlake conducted no investigation of plaintiff's complaint.

67. Westlake did not contact the dealership and inquire about plaintiff's complaint.

68. Westlake told plaintiff there was nothing it could do to help him.

69. Plaintiff asked Westlake to provide him a copy of the RIC.

70. At first, Westlake told plaintiff that it was not allowed to provide him with a copy of the RIC.

71. After several subsequent telephone calls to Westlake, Westlake told plaintiff that it did not have a copy of the RIC to provide to him.

72. It was not until after plaintiff made yet more telephone calls to Westlake, including to its corporate office, that Westlake relented and provided plaintiff with a copy of the RIC.

73. On the RIC, plaintiff again saw the unauthorized, additional charge of $1,500.

74. Plaintiff saw that this charge was for purported "Anti-Theft".

75. Plaintiff neither requested nor consented to purchase anything at the dealership that could be considered "Anti-Theft".

76. The dealership inserted the $1,500 charge into plaintiff's transaction without his knowledge or consent.

77. Plaintiff also saw purported electronic signatures on the RIC for the first time.

78. The dealership attached plaintiff's purported electronic signatures on the RIC.

79. By reason of defendants' aforesaid fraudulent, abusive and deceptive conduct, plaintiff suffered and continues to suffer financial harm.

80. By reason of defendants' aforesaid fraudulent, abusive and deceptive conduct, plaintiff suffered and continues to suffer non-financial harm, *viz*., loss of enjoyment of life, unhappiness, loss of money, loss of the value of money, loss of sleep, loss of time, anxiety, aggravation, irritability, upset, anguish and emotional distress.

## VIOLATIONS BY THE DEALERSHIP

### AS AND FOR A FIRST CAUSE OF ACTION

### TILA–15 U.S.C. § 1638(b)

### (Failure To Provide TILA Disclosures Prior To Consummation)

81. Plaintiff re-alleges paragraphs 1-80 as if fully re-stated herein.

82. The TILA disclosures were contained in the RIC.

83. Except for the RIC, the TILA disclosures were not contained in any document which the dealership provided to plaintiff.

84. The RIC contained plaintiff's purported electronic signature.

85. Jay did not provide plaintiff with any document before Jay consummated the sale of the Vehicle to plaintiff.

86. Jay did not provide plaintiff with any document on paper before Jay consummated the sale of the Vehicle to plaintiff.

87. Jay did not provide plaintiff with the TILA disclosures before Jay consummated the sale of the Vehicle to plaintiff.

88. Jay did not provide plaintiff with the TILA disclosures on paper before Jay consummated the sale of the Vehicle to plaintiff.

89. Jay attached plaintiff's electronic signatures to the RIC.

90. Jay placed the purported electronic signatures of plaintiff on the RIC without first providing to plaintiff a copy of the TILA disclosures.

91. Jay placed the purported electronic signatures of plaintiff on the RIC without first providing to plaintiff a copy of the TILA disclosures in a form plaintiff could keep.

92. The dealership failed to give plaintiff a copy of the required TILA disclosures in a form he could keep prior to the consummation of the transaction on July 16, 2022.

93. The dealership failed to give plaintiff a copy of the required TILA disclosures in a form he could keep, or at all, prior to the consummation of the transaction, in violation of 15 U.S.C. § 1638(b) and Regulation Z, 12 C.F.R. § 226.17(b).

94. The dealership is liable to plaintiff in the amount of twice the finance charge, and for actual damages and reasonable attorneys' fees, costs and disbursements in accordance with 15 U.S.C. § 1640.

95. The dealership acted willfully and knowingly in its misconduct herein.

## AS AND FOR A SECOND CAUSE OF ACTION

TILA–15 U.S.C. § 1638(a)

(Misstatements Of TILA Disclosures)

96. Plaintiff re-alleges paragraphs 1-95 as if fully re-stated herein.

97. The amount financed disclosed on the RIC is $13,545.18.

98. The dealership fraudulently and deceptively increased the amount financed to $13,545.18 by including $1,500 for purported "Anti-Theft", without plaintiff's knowledge or consent.

99. Plaintiff did not have the actual use of $13,545.18 in monies loaned.

100. The RIC materially misstates the amount financed for this consumer credit transaction, in violation of 15 U.S.C. § 1638(a)(2) and Regulation Z, 12 C.F.R. § 226.17.

101. The finance charge disclosed on the RIC is $4,984.98.

102. The finance charge disclosed on the RIC of $4,984.98 does not include the fraudulent and deceptive $1,500 charge for the "Anti-Theft" which the dealership added to the transaction only because plaintiff purchased the Vehicle on credit and which would not have been added had plaintiff purchased the Vehicle in a cash transaction.

103. The actual finance charge imposed by the RIC includes the fraudulent and deceptive amount of $1,500 charged by the dealership incident to the extension of credit.

104. Therefore, the actual finance charge imposed by the RIC, but not disclosed, was $1,500 greater, for a total finance charge of $6,484.98, not the disclosed finance charge of only $4,984.98.

105. The RIC therefore materially misstates the finance charge for this consumer credit transaction, in violation of 15 U.S.C. § 1638(a)(3) and Regulation Z, 12 C.F.R. § 226.17.

106. The annual percentage rate disclosed on the RIC is 11.89%.

107. By 15 U.S.C. § 1638(a)(4), the annual percentage rate is the finance charge expressed as a percentage.

108. Because the finance charge disclosed on the RIC is materially misstated, the annual percentage rate is also materially misstated.

109. The actual annual percentage rate imposed by the RIC is greater than the 11.89% disclosed on the RIC.

110. The RIC materially misstates the annual percentage rate for this consumer credit transaction, in violation of 15 U.S.C. § 1638(a)(4) and Regulation Z, 12 C.F.R. § 226.17.

111. The dealership is liable to plaintiff in the amount of twice the finance charge, and for actual damages and reasonable attorneys' fees, costs and disbursements in accordance with 15 U.S.C. § 1640.

112. The dealership acted willfully and knowingly in its misconduct herein.

WHEREFORE, plaintiff respectfully prays that judgment be entered against defendants as follows:

(a) awarding twice the finance charge, actual damages and reasonable attorneys' fees, costs and disbursements in accordance with 15 U.S.C. § 1640 against Millennium Toyota;

(b) awarding actual, compensatory and punitive damages for common-law fraud in an amount to be determined at the time of trial;

(c) enjoining each defendant from committing further deceptive acts and practices towards plaintiff, pursuant to NYGBL § 349;

(d) awarding actual damages pursuant to NYGBL § 349 in an amount to be determined at time of trial;

(e) in the alternative to (d), awarding statutory damages pursuant to NYGBL § 349 in an amount to be determined at time of trial;

(f) awarding treble damages pursuant to NYGBL § 349 in an amount to be determined at time of trial;

(g) awarding punitive damages pursuant to NYGBL § 349 in an amount to be determined at time of trial;

(h) awarding reasonable attorneys' fees, costs and disbursements pursuant to NYGBL § 349(h);

(i) awarding relief under MVRISA and reasonable attorneys' fees, costs and disbursements;

(j) awarding pre-judgment interest; and

(k) for such other and further relief as may be just and proper.

DEMAND FOR TRIAL BY JURY

Plaintiff requests trial by jury on all issues so triable.

Dated: New York, New York
July 17, 2023.

*<u>/s/ Novlette R. Kidd</u>*
NOVLETTE R. KIDD, ESQ. (NK 9339)
FAGENSON & PUGLISI, PLLC
Attorneys for Plaintiff
450 Seventh Avenue, Suite 704
New York, New York 10123
Tel.: (212) 268-2128
Nkidd@fagensonpuglisi.com